**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DIANA L. SMITH,** | : | No. 3:04cv810 |
| **Plaintiff** | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| **JOANNE B. BARNHART,** *Commissioner* | : | |
| *of Social Security*, | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Presently before the Court for disposition are Plaintiff Diana L. Smith's ("Plaintiff") objections to Magistrate Judge Thomas M. Blewitt's ("Magistrate Blewitt") Report and Recommendation. The Report and Recommendation proposes that we deny Plaintiff's appeal of Commissioner Joanne B. Barnhart's ("Commissioner") decision to deny Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33. The parties have fully briefed this matter and it is ripe for disposition. For the reasons that follow, we will sustain Plaintiff's first objection and remand this case to the Commissioner.

**I.    Background**

    **A.    Procedural History**

On May 8, 2001, when she was forty-one years old, Plaintiff applied for social security benefits. (Social Security Record (R.) 12, 44). She alleged that she could not work because of fibromyalgia, migraine headaches, depression, irritable bowel syndrome, and poor memory. (R. 332). On November 21, 2001, Plaintiff's initial application for social security benefits was rejected. (R. 332). Thereafter, she requested a hearing before an administrative law judge ("ALJ"), which was held on August 22, 2002. (R. 50). At the hearing, Plaintiff testified to the

nature and severity of her medical conditions. (R. 348-72). On September 27, 2002, the ALJ issued an opinion rejecting Plaintiff's claim because he concluded that she can engage in substantial gainful work that exists in the national economy. (R. 12-19). Plaintiff requested review of the ALJ's decision, which the Appeals Council subsequently denied. (R. 3-5). Thus, the ALJ's decision was the final decision of the Commissioner.

### B.     Medical History

Plaintiff was born on October 1, 1959. (R. 93). She has a long history of fibromyalgia, migraine headaches, and mental conditions, and has been taking medication for these conditions for a number of years. She has been taking Paxil since 2000 and Amitriptyline since 1998. (R. 115). Plaintiff, however, has never been hospitalized to treat her migraines or depression. (R. 213).

On January 18, 2000, Plaintiff began treatment with Dr. Ross B. Moquin, M.D. at the York Medical Clinic following complaints of chest pain and diarrhea. (R. 186-88). From January to June 2000, Dr. Moquin treated Plaintiff for a variety of ailments, including migraine headaches, diarrhea, and nasal congestion. (R. 164, 178-88).

On April 29, 2000, Plaintiff went to the emergency room complaining of migraine headaches. (R. 140). She explained that twice a year she needs to go to the emergency room to treat her headaches. (R. 140). The examining doctor described her as "awake, alert and oriented times three appearing to be in no acute distress at the present time." (R. 140). The doctor gave her an injection for her pain and a prescription for Vicodin. (R. 140). He discharged her that day. (R. 140). On May 6, 2000, Plaintiff again visited the emergency room, where she was given Vicodin. (R. 181).

On June 13, 2000, Dr. Moquin met with Plaintiff, who complained of increasing fatigue, anxiety, and depressive reactions. (R. 178). Plaintiff suggested that she may have fibromyalgia, a condition that she had discussed with friends. (R. 178). Plaintiff also reported that her symptoms caused her to miss work. (R. 178). Dr. Moquin made an appointment for Plaintiff to see Dr. David Francois, M.D., a rheumatologist, in order to obtain an opinion about fibromyalgia. (R. 178-79). Additionally, he continued Plaintiff's Paxil and Amitriptyline. (R. 178-79).

On June 22, 2000, Dr. Francois evaluated Plaintiff. (R. 213). After performing a tender points test, he determined that she probably had fibromyalgia. (R. 214). He suggested that she continue her medications, but discontinue her supplements. (R. 214). He also suggested that she attempt to quit smoking cigarettes, which she smoked at a rate of one half a pack to a pack a day for thirty years. (R. 214-15). He ordered a number of further tests to expand his evaluation, and stated that he would like to see her again in two months. (R. 215).

On August 7, 2000, Dr. Moquil examined Plaintiff, and found that her mental condition was improving with Paxil and, although she continued to work, she sometimes overslept. (R. 173). She was no longer taking Amitriptyline, and Dr. Moquil decided to refrain from placing her back on this drug until Dr. Francois fully examined her. (R. 173).

On August 10, 2000, Dr. Francois saw Plaintiff for a follow-up appointment. (R. 215). The results of the numerous tests he previously ordered were negative or normal.[1] (R. 212). He diagnosed her with fibromyalgia, suggested that she take Flexeril every day and stated that

---

[1] Dr. Francois wrote, "Her laboratory studies on the 28th of June include a normal chemistry panel, with the exception of ALT 62. Hepatitis C antibody negative, anti-Ro and La antibodies negative, chest ex-ray normal. Follow up tests on the 5th of July . . .included normal liver function tests and CK. Hepatitis B surface antigen was negative." (R. 212).

3

he would like to see her in six months. (R. 212).

On September 18, 2000, Dr. Moquil re-evaluated Plaintiff's status. (R. 170-71). He stated, "regarding her depression, patient states she is feeling much better. Her demeanor is much more open and she has almost a twinkle in her eye and is much more spontaneous. She is feeling better." (R. 170). He observed that her fibromyalgia was being controlled by Dr. Francois, and switched her headache medication back to Amitriptyline because Flexeril had not controlled her headaches as well. (R. 170).

From November 2000 to January 2001, Plaintiff continued treatment at the York Health Clinic for her various ailments, including an earache and migraine headaches. (R. 161-67). Dr. Moquin emphasized that she should see Dr. Francois in February 2001 as planned. (R. 161).

On February 1, 2001, Plaintiff was re-evaluated by Dr. Francois for fibromyalgia. (R. 211). She complained of trigger point induced headaches, fatigue, and memory problems. (R. 211). Dr. Francois noted that laboratory studies indicated "negative or normal CBC, sed rate, and TSH." (R. 211). After disclosing the risks and benefits, he administered a trigger point injection and suggested cognitive behavioral therapy to improve her cognition and memory. (R. 211). The next day Plaintiff called Dr. Francois complaining of a "woozy feeling," increased headache, and back pain from the injection. (R. 212). Dr. Francois directed her to rest and contact him if she did not improve over several days. (R. 210). On February 23, 2001, after failing to reach Dr. Francois, Plaintiff complained of pain to his partner, Dr. Wolfe Blotzer, M.D., who increased her Amitriptyline dosage. (R. 209).

In March and April of 2001, Plaintiff continued to visit the York Clinic and the

4

emergency room to treat her headaches. (R. 137, 155-59). Additionally, she was examined by Dr. Scott Cherry, a neurologist, who diagnosed her with migraine headaches and fibromyalgia. (R. 157-58).

On May 8, 2001, Plaintiff returned to rheumatologist Dr. Francois for an analysis of her fibromyalgia. (R. 208). She complained that she had endured a difficult period since her last visit due to stress at work. (R. 208). Dr. Francois noted that she had contacted his office eight times since her previous February visit. (R. 208). He observed that her daily medications consisted of Synthroid, Paxil, Amitriptyline, and Darvon, and the Darvon was not providing pain relief. (R. 208). Thus, he suggested that Plaintiff take half her usual dosage of Paxil for seven days, and then refrain from taking Paxil completely for seven days. (R. 208). During this "washout period," he prescribed Celexa and substituted Ultram for Darvon. (R. 208). He explained that Ultram is a narcotic with side affects, and can be habit forming. (R. 208). He also referred Plaintiff to a psychologist and prescribed a six-week work leave of absence to rework her medical therapy regimen. (R. 208). Accordingly, Plaintiff stopped working, but failed to return after six weeks, and has not worked since that date. (R. 208).

Plaintiff attended her appointment with the psychologist on May 30, 2001, and she was diagnosed as depressed. (R. 203). The counselor noted that the depression impaired her concentration, caused her to sleep excessively, and reduced her appetite. (R. 201-03). Plaintiff had three more appointments with the psychologist in June 2001, but cancelled two of them and failed to attend the third. (R. 200).

On September 5, 2001, Plaintiff attended a follow-up appointment with Dr. Francois. (R. 206). He noted that his adjusted medication regimen resulted in fewer migraine headaches

5

and less pain. (R. 206). He noted that she still had problems with depression, anxiety, and insomnia. (R. 206). As a result, he increased her Celexa dosage and recommended that she resume taking Darvon. (R. 206).

On November 1, 2001, Richard F. Small, P.H.D., a state agency psychologist, reviewed Plaintiff's medical records and concluded that her mental condition was not a severe impairment. (R. 226). In his report, he checked boxes indicating that her depression did not result in episodes of decompensation and only mildly restricted her concentration, persistence, pace, and activities of daily living. (R. 236). He noted that she cared for her pets, could manage her personal care, drove twice a week for ten miles, accomplished some cooking and cleaning with breaks, wrote notes to help herself remember medicines, and could interact with others. (R. 238).

On February 28, 2002, Plaintiff again reported that she was doing "somewhat better," but she still had bad days. (R. 281). Dr. Francois determined that her fibromyalgia was improved. (R. 281). Plaintiff stated that she continued to have problems with depression. (R. 281). As a result, Dr. Francois increased her Celexa dosage and directed her to use Tylenol with Codeine as needed for severe pain only. (R. 281).

On May 30, 2002, Dr. Francois observed that Plaintiff improved with Tylenol #4, although she had mild drowsiness and constipation. (R. 280). He provided her with refills of Tylenol, but deferred adjustment of her psychiatric medication because she was scheduled to see a psychiatrist in the following months. (R. 280).

On August 20, 2002, psychologist Julie D. Swope diagnosed Plaintiff with depression and post traumatic stress disorder. (R. 253). She issued a report with boxes checked

indicating that Plaintiff was markedly impaired in her ability to understand, remember, and carry out detailed instructions. (R. 253). She found that Plaintiff was also markedly impaired in her ability to interact appropriately with the public and to respond appropriately to work pressures or changes in a usual work setting. (R. 254). Dr. Swope found that Plaintiff was only moderately impaired in her ability to: 1) understand, remember or carry out short and simple instructions; 2) make judgments on simple work-related decisions; and 3) interact appropriately with co-workers. (R. 253-54). She declared that Plaintiff was only slightly impaired in her ability to interact appropriately with supervisors. (R. 254).

## II.   Standard

In disposing of objections to a magistrate's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made. 28 U.S.C. § 636(b)(1)(C); see also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions. Id.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It is less than a preponderance of the evidence, but more than a mere scintilla. Id.

## III.   Disability Definition

7

"Disability" is defined in the Social Security Act in terms of the effect a physical or mental impairment has on a person's ability to perform in the workplace.  In order to receive disability benefits, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of less than 12 months."  42 U.S.C.A. § 423(d)(1)(A).  The Act further provides that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 423(d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 459-60 (1983).

In the analysis of disability claims, the Commissioner employs a five-step sequential evaluation.  20 C.F.R. § 416.920.  The initial three steps are as follows: 1) whether the applicant is engaged in substantial gainful activity; 2) whether the applicant has a severe impairment; 3) whether the applicant's impairment meets or equals an impairment listed by the Secretary of Health and Human Services as creating a presumption of disability.  If the claimant cannot establish step three, she must demonstrate: 4) that the impairment prevents the applicant from doing past relevant work.  See 20 C.F.R. §§ 404.1520, 416.920.  If the applicant establishes steps one through four, then the burden is on the Commissioner to demonstrate the fifth step; that there are jobs in the national economy that the claimant can perform.  Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs., 48 F.3d 114, 117 (3d Cir. 1995).

**IV.     ALJ/Magistrate Decision**

The ALJ found Plaintiff was not disabled within the meaning of the Act because her impairments did not limit her ability to engage in substantial employment that exists in the national economy. The magistrate proposes that we affirm each step of the decision.

In the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity. In the second step, he found that Plaintiff's fibromyalgia and migraine heachaches were severe impairments, but her obesity, cardiac condition, irritable bowel syndrome, and depression were not severe. In the third step, the ALJ found that fibromyalgia and migraine headaches are not the medical equivalent of any impairment listed by the Secretary of Health and Human Resources as creating a presumption of disability. In the fourth step, he concluded that Plaintiff cannot perform any of her past relevant work. In the fifth step, however, he determined that Plaintiff retains the capacity for work that exists in significant numbers in the national economy and thus is not disabled within the meaning of the Act. Magistrate Blewitt determined that the ALJ committed no error in any of these steps, and declined to remand to the ALJ to allow the Plaintiff to submit evidence obtained subsequent to the ALJ's decision.

**V.     Discussion**

Plaintiff presents four objections to the magistrate's decision. First, she argues that we should not uphold the ALJ's step two determination that her depression, anxiety, and obesity are not severe impairments. Second, she contends that the ALJ erred in determining that Plaintiff's subjective complaints of her limitations were not credible. Third, she asserts that the ALJ erred in finding that Plaintiff can perform jobs that exist in substantial numbers in the

9

national economy. Fourth and finally, Plaintiff contends that we should remand this case to the ALJ to allow him to consider new evidence.

We find that the ALJ erred in concluding that Plaintiff's depression was not a severe impairment. Thus, we will remand to the ALJ to analyze whether her depression, or a combination of her impairments, amounts to a disability under the Act. Plaintiff's remaining objections are moot, and we need not address them here.

### A.     Severe Mental Impairment

A medically determinable impairment or combination of impairments is not severe if it does not significantly limit an individual's physical or mental ability to do basic work activities. McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities include understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(3)-(6).  "An applicant need only demonstrate something beyond 'a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.'"  Id. (citing SSR 85-28).  We must resolve all reasonable doubts in favor of the applicant. Newell v. Commissioner of Social Security, 347 F.3d 541, 547 (3d Cir. 2003).

In concluding that Plaintiff's depression was not severe, the ALJ rejected Dr. Swope's report in favor of Dr. Small's because he deemed Dr. Swope's report inconsistent with Plaintiff's description of the limitations in her daily activities and the medical evidence in the record. (R. 15). Based on these two criteria, he found that Plaintiff's mental condition was not

10

a severe impairment.

Plaintiff challenges the ALJ's rejection of Dr. Swope's opinion. She argues that her daily activities are consistent with a severe mental impairment and the ALJ should have discounted Dr. Small's opinion rather than Dr. Swope's. We will consider each of these arguments separately.

### 1. Daily Activities

We find that the ALJ erred in concluding that Dr. Swope's report was not consistent with Plaintiff's own testimony regarding the limitations in her daily activities. Dr. Swope diagnosed Plaintiff with depression and post traumatic stress disorder. (R. 253). She opined that Plaintiff was markedly impaired in her ability to understand, remember, and carry out detailed instructions. (R. 253). She found that Plaintiff also was markedly impaired in her ability to interact appropriately with the public and to respond appropriately to work pressures or changes in a usual work setting. (R. 254). Dr. Swope found that Plaintiff was only moderately impaired in her ability to: 1) understand, remember or carry out short and simple instructions; 2) make judgments on simple work-related decisions; and 3) interact appropriately with co-workers. (R. 253-54). She declared that Plaintiff was only slightly impaired in her ability to interact appropriately with supervisors. (R. 254). She reasoned that Plaintiff had a flat affect, depressed mood and suicidal ideation. (R. 253). Plaintiff also "disassociates frequently" and is "[e]asily stressed by changes." (R. 253).

The ALJ found this diagnosis inconsistent with Plaintiff's own testimony regarding her limitations because Plaintiff stated that she can perform light household chores, take care of her pets, and interact with others. We find that Dr. Swope's findings are entirely consistent

11

with Plaintiff's daily activities, and the ALJ improperly substituted his own medical opinion for Dr. Swope's.

In her daily activities worksheet Plaintiff indicated that she can feed and bathe her cats, although she does not bathe them often. (R. 63). She can clean her house with "frequent breaks." (R. 64). After ten minutes of work she has to rest for fifteen to twenty minutes. (R. 64). She takes one break while changing and making her bed. (R. 65). At times, she cannot remember if she took her medicine or what time she took it, and therefore writes herself notes. (R. 65). She has problems getting along with her family, friends, and neighbors because she feels like they do not understand what fibromyalgia feels like and because she feels very different from everyone. (R. 66). She does not engage in activities with relatives or friends because she is not close with her family and needs to distance herself from them in order to feel sane. (R. 66). She generally responds well to criticism, unless she is humiliated. (R. 66). She can plan when to attend appointments, but arises from bed, finishes household chores, and starts meals only when she is able. (R. 66). She gets confused when confronted with instructions and has to request explanation. (R. 67). Similarly, when faced with changes in her daily schedule she feels frustrated and out of sorts. (R. 67). She was unable to timely complete her work responsibilities because she had poor concentration and was forgetful. (R. 67). If changes occurred at work she would be distracted until she became accustomed to the change. (R. 68). She suffered from fatigue and sometimes no amount of rest could alleviate it. (R. 68).

Both Dr. Swope and Plaintiff stated that her concentration and ability to focus at work were impaired. Similarly, Dr. Swope concluded that Plaintiff's adaptability to change was

12

impaired, and Plaintiff herself stated as much. Dr. Swope opined that Plaintiff does not interact well with others and Plaintiff described that she does not interact with her family or friends because she feels that nobody understands her and she is different from everyone. Furthermore, the activities that Plaintiff did perform, household chores, personal needs, and taking care of pets, do not require the abilities that Dr. Swope attests were impaired, such as interaction with others, taking instruction, concentration, memory, and focus. Therefore, we find that the ALJ's conclusion that Dr. Swope's opinion was contrary to Plaintiff's daily activities is not supported by the evidence in the record and no reasonable person could find the evidence sufficient to support the ALJ's conclusion.

Moreover, the ALJ's determination of whether Plaintiff's household activities were consistent with the mental impairments described by Dr. Swope is a medical opinion beyond his expertise. He "impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own experience against that of a physician who presents competent evidence." Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985). Nowhere in the record does a medical expert describe what household activities are or are not consistent with the mental impairments Dr. Swope described. In concluding that Plaintiff did not have a severe mental impairment, Dr. Small did recite some of her activities, but he never explained whether or how these activities factored into his conclusion that she did not have a severe mental impairment. (R. 238). An ALJ may not evaluate medical evidence based on his own lay opinion. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). Therefore, we find that the ALJ erred in determining that Plaintiff's daily activities are inconsistent with a severe mental impairment.

### 2. Medical Record

We also find that the ALJ erred in rejecting Dr. Swope's report as contrary to the other medical testimony in the record. The medical evidence he relied on was the report of Dr. Small, the state agency physician, and Dr. Moquin's observations of Plaintiff during an exam.[2] The ALJ observed that Dr. Small, the state agency physician, determined that Plaintiff did not have a severe mental impairment and her mental condition resulted in only mild limitations. (R. 15). Thus, Dr. Small's diagnosis was contrary to Dr. Swope's.

In explaining his reliance on Dr. Small's report, the ALJ remarked that he noted that Plaintiff was able to engage in light household chores, care for her personal needs, care for her pets, and interact with others. (R. 15). Dr. Small, however, did not conclude that her daily activities were inconsistent with her alleged mental limitations. He merely recited them in short-hand notes without explaining the relevance to his disability or limitations analysis. In a section entitled "consultant's notes," Dr. Small wrote:

The claimant alleges disability due to physical ailments, depressionand [sic] poor memory.

43.

Wellspann-5/01 (msw)
on leave due to fibromyalgia
Depression- amitriptiline, sythroid and celexa

---

[2] It is not entirely clear what medical evidence the ALJ relied upon in rejecting Dr. Swope's opinion. The ALJ simply stated, "Dr. Swope's opinion is not consistent with the other medical evidence in the Record." (R. 15). The ALJ did not, however, elaborate on what "other medical evidence" he considered to be contrary to her opinion. "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Cotter v. Harris, 642 F.2d 700, 705-06 (3d Cir. 1981). As Dr. Small's opinion and Dr. Moquin's observations are the sole medical evidence regarding depression referenced by the ALJ in his entire opinion, we must assume that this is the evidence he found contrary to Dr. Swope's report.

Dr. Mills -depression was 5th medical dx

DAQ lives with son and pets
cares for pets
personal care ok drives a couple of times a week ten miles
some cooking, takes breadks [sic], cleans
writes notes to remember medicines
can interact with others
limits mostly due to fibromyalgia
(R. 238).

He did not explain or analyze whether these activities are inconsistent with limitations on memory, concentration, or ability to interact in a work environment; he merely recited them. Furthermore, his diagnosis of her condition and her limitations consists of a series of checked boxes. (R. 226-38). "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. . . . [W]here these so-called 'reports are unaccompanied by thorough written reports, their reliability is suspect. . . .'" Mason, 994 F.2d at 1065 (quoting Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986)). Thus, Plaintiff should have considered Dr. Small's report "weak evidence at best."[3]

The ALJ relied on one other portion of the record to find that Plaintiff's medical condition was not serious. He noted that in September 2000, Plaintiff told Dr. Moquin that she was feeling better regarding her depression, and Dr. Moquin stated that Plaintiff was doing well with treatment. (R. 170).

Thus, the ALJ rejected Dr. Swope's report because it conflicted with Dr. Small's report and Dr. Moquin's prognosis. We find that he erred in resolving the conflict. "Although it is clearly within the ALJ's statutory authority to choose whom to credit when witnesses give

---

[3] Dr. Swope's report also consisted of checked boxes, and thus also was "weak evidence." The ALJ, however, did not rely on this factor in rejecting her testimony.

conflicting testimony, the ALJ 'cannot reject evidence for no reason or the wrong reason.'" Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (quoting Cottor v. Harris, 642 F.2d 700, 707 (3d Cir. 1981)); Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).  In resolving this conflict, the ALJ explained that he rejected Dr. Swope's testimony because it conflicted with Plaintiff's own testimony about her limitations.  As discussed *supra*, the ALJ's conclusion that activities such as household chores, taking care of personal needs, and caring for pets somehow evinced an ability to interact with other people, focus, and concentrate in a work environment, was not supported by the record.[4]

In Morales, the Commissioner of Social Security found that the plaintiff had the ability to return to his past relevant work despite his claims that he suffered from a mental impairment.  225 F.3d at 316-17.  The plaintiff's physician, Dr. Erro, opined that he was seriously limited in his ability to "perform work-related tasks . . . follow work rules, relate to co-workers, deal with the public, use proper judgment, interact with a supervisor, function independently, and maintain attention or concentration." Id. at 317.  "He also concluded that Morales's ability to deal with work stress, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability was 'poor to none.'" Id.  In

---

[4] Furthermore, the ALJ erred by failing to address all of the relevant evidence.  In May 2001, following increased stress at work, Plaintiff underwent a mental health assessment.  (R. 203).  Plaintiff was under increased stress and compared her new boss to "Hitler."  (R. 201).  The therapist, Anne R, Helsabeck, found that Plaintiff had trouble with recent memory, distanced herself from her family for her "own sanity," slept too much due to depression, and felt as though her family treated her like a child.  (R. 202).  The therapist found that Plaintiff needed to alleviate her depressed mood in order to return to her previous level of functioning.  (R. 203).  These findings support Dr. Swope's conclusions that her ability to perform in a work environment was limited, and thus the ALJ erred in relying on Dr. Moquin's observations while ignoring contrary evidence in the record.  "The Secretary may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects." Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994).

contrast, Dr. Barrett reported that the plaintiff was either not significantly limited or only moderately limited in various work-related abilities. Id. at 314. This report was summarily affirmed by another non-treating physician, Dr. Brennan. Id. at 315.

The ALJ rejected Dr. Erro's report in favor of Dr. Barrett's and Dr. Brennan's opinions. Id. at 317. He reasoned that two other doctors, Dr. Jaffe and Dr. Lindner, observed that the plaintiff malingered while they examined him. Id. at 318. The ALJ further based his decision on his own observations of the plaintiff at the hearing and his finding that the plaintiff's demeanor evinced a lack of credibility. Id. at 318. The court found that the ALJ adopted the conclusions of Dr. Barrett and Dr. Brennan for the wrong reasons, stating, "[i]n choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion."[5] Id. at 317(citations omitted). The court cautioned that lay opinion was particularly inappropriate in cases of mental disorders. "The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability." Id. at 319. Here, as in Morales, the ALJ impermissibly resolved a conflict between two medical reports by relying on his own interpretation of evidence that was unsupported by the evidence.

---

[5] For this same reason, we find that the ALJ's credibility determinations were in error. A claimant's subjective complaints must be given 'great weight' when supported by medical evidence. Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993). The ALJ did not give Plaintiff's complaints "great weight" because he rejected Dr. Swope's report, and thus in his opinion, the complaints were not supported by medical evidence. (R. 15). Therefore, as we find that he erred in rejecting Dr. Swope's opinion, we must also find that he erred by not giving Plaintiff's subjective complaints their due weight. Mason, 994 F.2d at 1068 (finding that where the ALJ erred in rejecting a doctor's report that supported a claimant's complaints of pain, his analysis of the claimant's credibility was also tainted).

17

Morales also demonstrates that the ALJ erred in relying on Dr. Moquin's statement that Plaintiff was "doing well with medication therapy." (R. 14). The Morales court faulted the ALJ for placing improper weight on one doctor's opinion that the plaintiff was stable with medication. Id. at 318. "Dr. Erro's observations that Morales is 'stable and well controlled with medication' during treatment does not support the medical conclusion that Morales can return to work." Id. at 319. The court found that the plaintiff's stability and controlled behavior in the clinic was irrelevant to the inquiry of whether his mental condition impaired his work ability because "the work environment is completely different from home or a mental health clinic."[6] Id. Similarly, Dr. Moquin's impression of Plaintiff's demeanor during a physical examination for fibromyalgia is in no way indicative of how her mental condition will affect her ability to respond to the pressures of the work environment.

Thus, we find that the ALJ improperly resolved the conflict between Dr. Small's report and Dr. Swope's report. The two reports reached opposite conclusions, and the ALJ resolved the conflict by substituting his own analysis of Plaintiff's daily activities. Furthermore, his reliance on Dr. Moquin's impression of Plaintiff's demeanor was misplaced because it was irrelevant to the issue of Plaintiff's work limitations. We recognize that neither Dr. Small's report nor Dr. Swope's report was thorough, and both lacked severely in detail or analysis. However, given the lack of clarity, the ALJ should not have abandoned his analysis of Plaintiff's mental condition at such an early stage of the disability determination. "[G]reat care should be exercised in applying the not severe impairment concept. If an adjudicator is unable

---

[6] This rationale further underscores the error in relying on Plaintiff's ability to perform various household chores to discount a medical report that she is unable to perform at work. Whether or not Plaintiff can feed her cats, make her bed, and clean her home has no bearing on how well she will understand instructions from a boss, concentrate in the work environment, or respond to changes.

to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 547 n.5 (3d Cir. 2003) (citing SSR 85-28). Indeed, when faced with unclear or conclusory reports, "it [is] incumbent upon the ALJ to secure additional evidence from another physician." Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985). Therefore, we find that the ALJ erred in determining that Plaintiff had not established a severe mental impairment in the second step of the disability analysis.

**B.     Remand**

Having concluded that the ALJ erred, we must next decide whether to remand the case to the Commissioner for further administrative proceedings, or order that the Commissioner award benefits. Morales, 225 F.3d at 320. The sole evidence regarding Plaintiff's mental impairments are two conclusory reports, consisting of checked boxes and short-hand notes. Furthermore, as the ALJ erred at stage two, he did not develop the record regarding the application of steps three through five regarding Plaintiff's mental condition. Thus, we find the record insufficient to award her benefits at this time.

Accordingly, we will remand this case to the Commissioner with the instruction to gather additional evidence on Plaintiff's mental condition. After obtaining evidence, she must consider whether, in step two, Plaintiff's mental impairment, or some combination of her impairments, is severe within the meaning of the Act. Then, if it is severe either alone or in combination with other impairments, the ALJ must proceed through the remaining steps of the disability analysis to determine whether her impairments render her disabled. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DIANA L. SMITH,** | : | No. 3:04cv810 |
| **Plaintiff** | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| **JOANNE B. BARNHART,** *Commissioner* | : | |
| *of Social Security,* | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**ORDER**

**AND NOW**, to wit, this 25th day of July 2005, Plaintiff's objection (Doc. 17) to the Report and Recommendation suggesting that we uphold the Commissioner's determination that Plaintiff's mental condition is not severe is hereby **SUSTAINED**.

It is hereby **ORDERED** that this case is remanded to the Commissioner for a determination, consistent with the above opinion, of whether Plaintiff's mental impairment or some combination of her impairments including her mental impairment is a disability within the meaning of the Social Security Act.

**BY THE COURT:**

**s/ James M. Munley
JUDGE JAMES M. MUNLEY
United States District Court**

20